**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

**FILED**
JAMES J. WALDRON, CLERK
August 17, 2010
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: /s/Diana Reaves, Deputy

|  |  |
|---|---|
| IN RE: | CHAPTER 7 |
| James Patrick Duffy and Doreen Ann Duffy, | CASE NO.: 08-19126 (NLW) |
| Debtor. | **OPINION** |
| Thomas Poalillo and Michele Poalillo, | |
| Plaintiffs, | |
| | Adv. No.: 08-2307 |
| James Patrick Duffy and Doreen Ann Duffy, | |
| Defendants. | |

**Before:    HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Larry Lesnik, Esq.
Norris, McLaughlin & Marcus, PA
PO Box 5933
Bridgewater, NJ 08807-5933
Attorneys for Plaintiffs

Santo J. Bonanno, Esq.
1430 Route 23 North
Wayne, NJ 07470
Attorney for Debtors/Defendants

This adversary proceeding, tried before the court, arises from a failed joint business venture among Thomas ("Tom") Poalillo and Michele ("Michele") Poalillo (collectively the "Plaintiffs") and James ("Jim") Duffy and Doreen ("Doreen") Duffy (collectively the "Defendants"). The Plaintiffs claim that they have suffered damages in the amount of $165,047.31 as a result of Defendants' conduct, and that this sum should be held nondischargeable under Bankruptcy Code § 523(a)(2)(A) and (a)(4).

The following constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052. The matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and the Court has jurisdiction under 28 U.S.C. § 1334 and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984.

## FINDINGS OF FACT

The court has heard the testimony of the witnesses, considered the exhibits admitted into evidence and makes the following findings of fact:

### A. Terms of the Business Venture

The parties disagree as to who initiated the discussions about going into business together. The court finds that the decision was essentially a mutual decision and the product of a longstanding friendship. Both Plaintiffs and Defendants testified that they had known each other for ten years prior to establishing the joint venture. (Trial Tr. 16, 177) Tom testified that over the years they saw each other frequently. (Trial Tr. 17) Perhaps because of this lengthy friendship, the joint business venture was never reduced to writing. (Trial Tr. 19)

In broad terms, Plaintiffs and Defendants agreed (i) that Jim would act as the general

2

contractor, (ii) that FrontRunner LLC ("FrontRunner") would be the corporate vehicle through which the construction would be performed, and (iii) that Tom and Michele "would supply funds." (Id.)[1]

The most credible description of the acquisition of the properties that were to be rehabilitated was provided by Michele. According to Michele, Plaintiffs and Defendants agreed that such properties would be purchased jointly by her and Doreen "... because we both made more money than our husbands and it was just easier to go through the credit process that way." (Trial Tr. 31) In furtherance of the business venture, Michele stated that she and Doreen jointly acquired 6 Cedar Street, Riverdale, New Jersey ("No. 6") in May 2006 and 10 Cedar Street, Riverdale, New Jersey ("No. 10") in December 2006. (Trial Tr. 31)[2]

The purchase price of No. 6 was $310,000, including closing costs. (Id.) To pay the purchase price Michele and Tom gave a down payment of $71,000 by drawing on their home equity line of credit, and obtaining a mortgage from American Service Corp. in the amount of $240,000. (Id.) Michele further testified that Plaintiffs and Defendants agreed that when No. 6 was sold, the Plaintiff's home equity loan would be satisfied and the remaining funds would be equally divided. (Trial Tr. 32).

Michele also testified that under the business agreement FrontRunner would obtain the construction loan and the Defendants would initially contribute $10,000 to FrontRunner. (Id.).

Michele also testified that under the business agreement FrontRunner would obtain the construction loan and the Defendants would initially contribute $10,000 to FrontRunner. (Trial Tr.

---

[1] Doreen is the sole shareholder of FrontRunner. (Trial Tr. 117).

[2] There appears to be a slight discrepancy regarding the date for acquisition of No. 6. The deed reflects a date of June 8, 2006 (Ex. P-29)

3

32). Michelle further testified that Plaintiffs and Defendants agreed that when No. 6 was sold the Plaintiff's home equity loan would be satisfied and the remaining funds would be equally divided. (Id.)

In response to her counsel's query as to whether the $10,000 deposited by Defendants into FrontRunner account would likewise be paid prior to dividing the remaining funds, Michele stated as follows: "No. In fact, I have something in writing from Doreen that says that she would pay $35,000 back towards the $71 that I borrowed but no reference to her $10,000. No." (Trial Tr. 32-33).

Doreen's testimony regarding why she and Michele jointly acquired the properties diverges from Michele's testimony and is less credible. Doreen stated that she and Michele acquired the properties because both Tom and Jim had bad credit. (Trial Tr. 113)[3] She claims that Michele told her about Tom's poor credit in May 2006 prior to the purchase of No. 6. (Trial Tr. 159) Tom denied that he had a poor credit history. (Trial Tr. 15) He stated that he had never had a judgment entered against him and had never defaulted on any obligations. (Id.) Moreover, Tom stated that prior to entering into the joint business venture he and Michele had a credit rating in excess of 800. (Id.) Defendants did not elicit any testimony or submit any exhibit to contradict or rebut this testimony.

Doreen also did not give a credible explanation of the use for the $10,000 which she deposited in the FrontRunner checking account. She testified that she deposited this sum on June 22, 2006, and that the $10,000 was deposited into FrontRunner account for her personal use. (Trial Tr. 114, 160)

When asked why the $10,000 was not deposited into her personal account the following

---

[3] Tom did testify that he had poor credit. (Trial Tr. 178)

series of questions and answers took place:

> Q. All right. You've testified you deposited $10,000 into the FrontRunner account on June 22nd, correct?
>
> A. Yes.
>
> Q. That was obviously after the purchase had taken place for Number 6?
>
> A. Yes.
>
> Q. Okay. Why was that money deposited into that account?
>
> A. For my use. My personal use.
>
> Q. Well, you testified that you paid some personal bills out of that account –
>
> A. Um-huh.
>
> Q. – and you've given us, of course, copies of those checks, et cetera.
>
> A. Yes.
>
> Q. Why would – why were those bills not paid out of your personal checking account?
>
> A. Well, if you look at the date in June, as a teacher, we're not paid in July and August. That was my funds for July and August.
>
> Q. But this was money you had – you testified you got that money from the sale –
>
> A. From a sale.
>
> Q. – of a prior – another home unrelated to this business venture?
>
> A. Okay.
>
> Q. You or your husband had a $10,000 net profit, correct?

5

    A.    Yes.

    Q.    You still haven't explained why that wasn't deposited into your personal checking account. Why would you put that into FrontRunner Construction account?

    A.    Because I wasn't really sure if we were going to do any other jobs and this job took most of – all of Jim's time. So, I was putting money into my business.

    Q.    You were putting money into the business but then you weren't using it for the business?

    A.    I wasn't using it for this house, no, and I stated that from the beginning, that I couldn't use it for this. I wasn't sure if Jim and I would do other jobs at the same time we were doing the job with the Poalillos.

    Q.    Now, the bills that you paid, the personal bills you paid from FrontRunner, those could have been paid with your – from your own personal account, correct?

    A.    They could have been but I didn't have the funds in there.

    Q.    All right. And prior to June of 2006, is it fair to say your personal bills, household bills, were paid from your personal account?

    A.    Yes

(Trial Tr. 160-162)

       The court finds that Doreen's inability to articulate a credible reason for depositing allegedly personal funds into the joint venture business account results in the conclusion that Defendants intended the $10,000 to be their equity contribution to the business venture. This conclusion is reinforced by Doreen's concession that the $10,000 was deposited approximately two weeks after she and Michele had obtained title to No. 6. (Trial Tr. 160)

**B.     Conduct claimed as Fraudulent**

Plaintiffs claim that Jim intentionally failed to inform them that his two prior businesses, Duffy Contracting and Duffy Matrix (collectively "Duffy Companies"), had become insolvent and ceased operating. Tom testified that he understood that Jim was a contractor with his own company. (Trial Tr. 17) Tom testified that Jim never told him that the Duffy Companies had ceased operation. (Trial Tr. 17-18). On cross-examination by Plaintiff's counsel, Jim contradicted Tom's testimony. He stated that he had told Tom that he had stopped working under Duffy Contracting and Duffy Matrix and that he had told Jim why.[4] (Trial Tr. 192) Plaintiffs counsel queried Jim as to whether this testimony was consistent with testimony given at a prior Bankruptcy Rule 2004 Examination. However, after receiving Jim's response "I'm not sure, sir," Plaintiffs' counsel did not pursue the line of questioning. As a result, the record before the court on this claim by Plaintiff consists of contradictory statements, and as will be discussed later, surrounding facts that are equivocal.

Plaintiffs also argue that Jim intentionally did not inform them that three judgments had been entered against Jim personally when the Duffy Companies ceased operating.[5] Although, Tom conceded on cross-examination that he never asked Jim about prior businesses or whether judgments had been entered against him. (Trial Tr. 24) Michele flatly stated that "I would have never done this deal had I known that they had judgments against them and that there were issues that could potentially impact the ability to get this house done." (Trial Tr. 101) Jim admitted that he did not

---

[4] Jim testified that Duffy Contracting was in business for fourteen years before closing. He stated that Duffy Matrix was in business for five years before closing. (Trial Tr. 180-181) He attributed the demise of the Duffy Companies to a $438,000 loss resulting from the insolvency of another contractor. (Trial Tr. 180)

[5] From Doreen's testimony it appears that at least one of the judgments, Glen Rock Lumber was obtained in 2005. (Trial Tr. 116, 119)

7

tell Tom about the judgments. (Trial Tr. 193)

He further conceded that he had stated at his Bankruptcy Rule 2004 Examination that this was information he would have wanted to know about a partner. (Id.) However, when read as a whole, Jim's statements were actually less of a concession. The Bankruptcy Rule 2004 Examination excerpt (P-30) occurred as follows:

> Q: Did Tom prior to entering into this business arrangement with you know about the judgments that had been entered against you personally?
>
> A: No.
>
> Q: You never told him about that, right?
>
> A: That's personally.
>
> Q: Meaning that it was personal –
>
> A: The answer is no.
>
> Q: You didn't tell him because it was personal and you just didn't think he needed to know? Or were you embarrassed?
>
> A: No. I didn't say embarrassed. I said no, I didn't tell him. Did not tell him, didn't come up.
>
> Q: You didn't think it was relevant for him to know that in your prior business career you had essentially been unsuccessful and not been able to pay your bills?
>
> A: I'm sorry. I didn't like the way that was phrased. Let's hear it again.
>
> Q: I said, you didn't think it was relevant to let him know that in your prior business career you had been unsuccessful and not been able to pay your bills?
>
> A: That's not fair to say. And the reason bills were not paid is I got stuck from somebody that went bankrupt on me for a huge sum of money. That's why the bills weren't paid.

> Q: So you didn't think that it was relevant to tell him that you had three judgments that had been entered against you personally?
>
> A. No, I did not.
>
> Q: Would you have wanted a business partner to tell you that before you went into business with him or her?
>
> A: I wouldn't ask the question.
>
> Q: That wasn't my question. My question was, would you have wanted to know that?
>
> A: Yes.

The Glen Rock Lumber judgment against Jim is cited by Plaintiffs as particularly significant because Jim's construction estimate for No. 6 included Glen Rock as a source not only for materials, but also as a source for financing the project at a 10% interest rate. Plaintiffs argue the failure to identify Glen Rock Lumber as a judgment creditor was intended to deceive them into entering into the business venture. Jim testified that he intended to obtain both materials and financing from Glen Rock Lumber and that he met with a principal of Glen Rock Lumber. However, Glen Rock Lumber indicated that they didn't want to invest in the project and Jim informed the Plaintiffs that Glen Rock would not provide a loan. (Trial Tr. 178) Nonetheless, Plaintiffs decided to continue with the project. (Trial Tr. 179) In fact, they asked if he could find another lender. (Id.) That lender was Somerset Capital. (Trial Tr. 180)

Plaintiffs also claim that Jim intentionally deceived them by not disclosing at the outset that he was bi-polar. Michele stated that Jim told her sometime after the venture was formed that he was bi-polar, and that if she had known about this condition and the judgments she would not have undertaken the business venture. (Trial Tr. 71) When asked what effect the alleged bi-polar condition had on Jim's conduct of the job, Michele testified: "A bi-polar disorder would have a

9

significant impact on getting the job completed based upon the highs and lows of the disease and condition. Absolutely. Bipolar disorder is documented to that effect."[6] (Trial Tr. 104) Notably, Tom testified that he never observed any conduct by Jim that caused him to question Jim's ability to perform construction work. (Trial Tr. 25)

Jim denies that he informed Michele that he was bi-polar. (Trial Tr. 194) Jim did testify that he began to suffer from depression about the time the Duffy Companies failed:

> Q: Did there come a time when you did have some problems regarding depression?
>
> A: Yes.
>
> Q: What caused that?
>
> A: The downfall of my construction business, not getting paid. My father passed away and then right after the time when Duffy Contracting went down, my brother had gotten sick and he was out for 11 months. That was a big part of why the company went down as well because I just couldn't handle all of it all at one time, all of the work and all of the loss.

(Trial Tr. 180-81)

Jim also testified that he was under medical care for depression from 2004 through 2006, including the time period in which the business venture was formed and operating. (Trial Tr. 194) He conceded that he did not tell the Plaintiff's that he was being treated for depression. Jim described his depression as "very personal." (Trial Tr. 195)

### C. Documentation of Payments from FrontRunner Checking Account

Funds from the Somerset Capital Loan were placed in the FrontRunner checking account.

---

[6] Although defendant's counsel did not object, this testimony about Jim's alleged bi-polar condition is improper lay opinion. See, *Hirst v. Inverness Hotel Corp.,* 544 F.3d 221, 227 (3rd Cir. 2008)(lay opinion testimony cannot be based on scientific, technical or other specialized knowledge).

10

(Trial Tr. 36)[7] These funds were intended to be used to pay the construction costs associated with No. 6, a salary to Jim of $1,200 weekly and the mortgage payments for No. 6. (Trial Tr. 37) Michele stated that although it was intended that Defendants would obtain Plaintiffs' consent prior to disbursing funds from the FrontRunner account, Plaintiffs were not always noticed when funds were disbursed. (Trial Tr. 37)

Plaintiffs contend that funds from the FrontRunner account must have been misused by Defendants because the disbursements were inadequately documented. Michele testified at length about the lack of adequate documentation for checks issued in payment to contractors and suppliers. (Trial Tr. 55-71, Exs. P-3 to P-26) For example, Defendants provided Plaintiffs with an invoice that predated their joint business venture. (Trial Tr. 57-58, P-8) Michele testified, for example that payment in the amount of $948.46 to an entity known as Rapid Pump was made prior to an invoice in the amount of $841.47 being issued. (Trial Tr. 58-59, Ex. P-10) From her analysis of the invoices and the FrontRunner checking account, Michele concluded that checks approximating $78,000 were paid to vendors without supporting documentation. (Trial Tr. 68)

Additionally, based on her belief that work had stopped on No. 6 at the end of 2006, she questioned invoices and payments made in February 2007 (Trial Tr. 60, Ex. P-13) Finally, Michele produced pictures of No. 6 taken in June 2007 (P-4) and testified that the observable condition of the house could not justify the payments made from the FrontRunner checking account. (Trial Tr. 49-51)[8]

---

[7]The total amount of the construction loan received from Somerset Capital amounted to $301,000.00 (Trial Tr. 83)

[8] Michele agreed with her counsel that the funds must have been spent elsewhere. The testimony occurred as follows:

> Q:    So, correct me if I'm wrong here. There was $300,000, $301,000, that ran

11

From her review of the FrontRunner bank statements Michele crafted a chart that she believes reflects payments made for the Defendants' personal expenses. (Trial Tr. 41, 67-68, P-26 and P-2) The chart (P-2) identifies payments totaling $22,183.76.[9] Michele also presented at trial her calculation of total damages suffered, in the amount of $263,525.82. (P-27) This damage claim was also amended and presented as Schedule C to Plaintiff's Post-Trial Submission. Schedule C asserts a damage claim of $165,047.31.

Testimony from Doreen and Jim largely explained the items questioned by Michele. (Trial Tr. 119-129 and 183-187) For example, Doreen conceded that she mistakenly included invoices from 2005 (Trial Tr. 123-124) Both testified that work was performed on No. 6 until the end of April 2007 (Trial Tr. 129, 183) Jim also stated that he was not engaged in any other construction work while this business venture was ongoing. (Trial Tr. 187)

Doreen testified that the last construction draw from Somerset Capital was in April 2007. (Trial Tr. 120) From D-1 it appears that through April 13, 2007, the sum of $218,525.00 was

---

through the FrontRunner account or perhaps $311,000 based on the $10,000 that Mr. Bonanno indicates his client put into it. $70,000 in round numbers went to purchase the house. And the rest of the money was used for the septic, the slab, and the front steps?

A:   Yes. You know what, Larry? I need to correct that. I think the Factory Direct Modular, the final bill, was somewhere closer to $83,000. I apologize. So, yeah, $83,000 and then yes, the rest of your question, the answer is yes.

Q:   So that would be more that $220,000, maybe as much as $230,00 that was spent elsewhere?

A:   Correct.

(Trial Tr. 70-71)

[9]Subsequently, as Exhibit A to Plaintiffs' Post-Trial Submission the personal expenses claimed to have been paid from the FrontRunner account were asserted to total $20,963.22.

disbursed by Somerset Capital. She also testified that construction draws were only authorized by Somerset Capital after they ascertained sufficient work had been completed. (Trial Tr. 120) On cross-examination Michele acknowledged that Somerset Capital only permitted a draw if a certain percentage of completion had been achieved. (Trial Tr. 87)

Jim's testimony further undercut Michele's testimony that construction work halted in December 2006. Jim testified that the modular home was delivered on December 22, 2006, and that substantial work was performed thereafter:

> Q:   Ok. What work did you do after it was delivered?
>
> A:   Well, the house is delivered just on a – it's not even on a foundation. It's only the top half of the house that's modular. The whole lower half was built by me and the subcontractors and we had all the windows down below. We had all the framing that had to be completed down below, all the sewer tie-in, the underground – there's a zero tolerance for water run-off so around all the foundation we had to put in drainage. That's what the filter fabric is used for and stone is used for, to create all that. That's what I did.
>
> Q:   And how far – you said you worked through, into April of '07. What work was done in January, February, March, and April of '07?
>
> A.   The lower level had to be graded and stoned and a poured concrete foundation poured, windows, sliding doors had to be put in. The septic system had to be finalized and closed up. The – all the framing on the whole lower half. Stairs were installed. The front stairs were done with a mason while I was there with him, helping him do that. Grading on the property.

(Trial Tr. 183-184)

Jim further testified that when the work on No. 6 was stopped, all that remained was finishing the sheetrock, pouring the garage floor, installing the garage doors and front railings, landscaping and spackling and painting. (Trial Tr. 184) He estimated that the work could have been completed in six weeks and that the $45,000 funds remaining from the Somerset Capital

13

construction loan would have been sufficient. (Trial Tr. 185)[10]

However, Doreen's testimony regarding the payments on P-2, identified as personal expenses was less credible. It was evident to the court that she was speculating that the undocumented cash payments were for day laborers and that the undocumented payments to Jim were for materials in connection with No. 6. (Trial Tr. 138-140) Jim's testimony that day laborers were used on the No. 6 construction site does not mitigate her failure to adequately maintain records, as his testimony was equally non-specific.

Doreen further testified that she was entitled to reimbursement for three mortgage payments for No. 10 that she made from her personal checking account. (Trial Tr. 147-153) However, this contention and effort to construct a setoff fails in light of her testimony that Michele was not reimbursed for mortgage payments she made for No. 10 and that the agreement among the parties was to use the Somerset Capital construction loan solely for construction on No. 6. (Trial Tr. 175-176) No construction loan proceeds for No. 10 were ever deposited into the FrontRunner account as they were not able to obtain such a loan. (Trial Tr. 52).

## DISCUSSION

It is widely agreed that in furtherance of the fresh start policy of the Bankruptcy Code "exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors." *In re Cohn,* 54 F.3d 1108, 1113 (3d Cir. 1995). However, a competing and equally longstanding bankruptcy policy recognizes the need for a "completely unencumbered new beginning to the 'honest but unfortunate debtor". *Grogan v. Garner*, 498 U.S. 279, 287 (1991)

---

[10]On cross-examination Michele testified that the remaining funds available from Somerset Capital (approximately $45,000) were not drawn down because she objected.

(quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934)). The court's task then, is to be mindful of both policies when weighing the evidence placed before it.

A party asserting its debt to be nondischargeable must prove each element of its cause of action by a preponderance of the evidence. *Grogan,* 498 U.S. at 287-88. That is, the plaintiff must "convince [the factfinder] upon all the evidence before [it] that the facts asserted by the plaintiff are more probably true than false." *Applebaum v. Henderson (In re Henderson),* 134 B.R. 147, 156 (Bankr. E.D. Pa. 1991)(quoting *Burch v. Reading Co.*, 240 F.2d 574, 579 (3d Cir. 1957).

### A.    Fraud

Bankruptcy Code § 523(a)(2)(A) states that debts for money, property, services or credit obtained by "false pretenses, a false representation or actual fraud, ..."are nondischargeable. Courts in the Third Circuit have held that to prove nondischargeability of a debt under this section a plaintiff must prove that:

1. The debtor represented a fact, opinion, intention or law;

2. The representation was false;

3. The representation was material;

4. The debtor obtained money, property or services through the misrepresentation;

5. The debtor knew at the time that the statement was false (or was made with reckless disregard for its truth);

6. The debtor intended the creditor to rely on the statement;

7. The creditor actually relied on the statement;

8. The reliance was justified;

9. The creditor sustained damage; and

15

        10.     The damages were the proximate result of the false representation.
*In re Casini,* 307 B.R. 800, 815 (Bankr. D.N.J. 2004)

    A misrepresentation or falsehood can occur even without an affirmative statement. Where the debtor has a duty to disclose, a finding of fraud may be predicated on a failure to disclose a material fact. *Wolstein v. Docteroff (In re Docteroff),* 133 F. 3d 210, 216 (3d Cir. 1997); *Citibank (S.D.), N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1089 (9th Cir. 1996); *Caspers v. Van Horne (Matter of Van Horne),* 823 F. 2d 1285, 1288 (8th Cir. 1987).

    The court readily agrees with Plaintiffs that Jim's prior business history, including the judgments entered against him personally, are material facts. However, the Plaintiffs have not demonstrated by a preponderance of the evidence that Defendants intentionally withheld those facts in order to deceive Plaintiffs into entering into the joint business venture.

    Considering the evidence as a whole, it appears to the court that this business venture was a product of a long friendship. Both Plaintiffs and Defendants testified to the longstanding friendship and the frequency with which they saw each other. As described by Tom, the business arrangement was very informal and simple: he and Michele would provide money, and through FrontRunner Jim and Doreen would undertake the construction. Their agreement was not reduced to writing, and there is no testimony that any party even considered doing so. In light of these facts it does not appear to the court that Plaintiffs and Defendants thought of themselves as business partners instead of, or in addition to, friends. In short, the court considers it more likely than not, that the parties believed they knew each other so well that further explanations or questions were unnecessary.

    Turning to the specific alleged omissions the testimony was mostly contradictory. Both Tom

16

and Michele testified that they did not know that the Duffy Companies had failed. On the other hand, Jim testified that he had told Tom about the companies and why they failed. Plaintiffs did not introduce any other evidence from which the court could infer nondisclosure. For example, there was no evidence from which the court could infer that Jim and Doreen lacked the ability on their own to renovate one or both of the houses for which the joint business venture was formed. There was no testimony or evidence that Jim was unemployed from 2004, when the Duffy Companies ceased operating, to 2006, when the parties undertook the joint business venture. Indeed, to the contrary, when the business venture was just being formed Jim and Doreen received the sale proceeds from a home that had just been renovated and sold. This was the very same type of project which the Plaintiffs and Defendants wished to undertake together.

   Jim did admit that he did not tell Tom about the judgments entered against him, and he did concede that he testified at his Bankruptcy Rule 2004 Examination that he would want to know about a partner's personal judgments. But neither of these statements provide a sufficient foundation for the conclusion that he intentionally omitted this information in order to deceive Plaintiffs. First, his unrebutted testimony is that he told the Plaintiffs at the outset that he had poor credit. While this disclosure is not a statement that creditors hold judgments against him, it conveys the same type of information. In other words, it constitutes a disclosure that either he has outstanding liabilities or a poor payment history (or both). Second, having disclosed his poor credit at the outset, there would be no reason to intentionally withhold information about judgments.

   Nor does it matter that one of the judgment holders is Glen Rock Lumber, who was identified as the potential lender on the construction estimate. (P-1) Jim testified that he spoke with a principal of Glen Rock lumber about providing construction financing. When the financing was declined he informed Plaintiffs. Only then (with Plaintiffs agreement) was a construction loan obtained from

17

Somerset Capital. There is no basis for inferring a deception from this sequence of events.

Finally, with regard to the allegation that with intent to deceive, Jim withheld information about his bi-polar disorder, other than Michele's testimony, there is no evidence that he suffers from such a condition. Jim testified that he began to suffer from depression at or about the time that (i) Duffy Companies failed, (ii) his father died and (iii) his brother became ill. He further testified that he was under a doctor's care and taking medication. He did admit that he did not disclose the fact that he was suffering from depression, but claims that he did so because it was a personal matter. Thus, once again the testimony is contradictory. However, here the surrounding facts permit an inference that there was no intent to deceive. The record reveals that Jim was working before the business venture began, and he testified credibly that he worked at the construction site for No. 6 through April 2007. Tom also testified that he did not observe any conduct by Jim that indicated that his job performance was impaired. Because it appears from the foregoing that to the extent he suffered from depression, it was being managed, the court infers that Jim believed he was not impaired and that it was not incumbent upon him to disclose to Plaintiffs that he was suffering from depression.

Even were the court to have found that the allegedly intentional omissions were a basis for dischargeability under § 523(a)(2)(A) there is insufficient evidence to find that the damages claimed by Plaintiffs were caused thereby. Michele's claim that no work was done at No. 6 after December was effectively countered by Defendants testimony. Her photographs (P-4) were unhelpful as there were unsupported by any testimony identifying deficiencies. Further, she acknowledged that she prevented the remaining $45,000 of the Somerset Capital loan from being drawn down. Jim testified that he could have finished the construction if the $45,000 had remained available, but did not have time and material estimates with him to support this assertion. Neither Plaintiffs nor Defendants

18

supplied an expert witness to support their version of the facts. Consequently, the court is not able to assess whether the construction at No. 6 could have been completed and sold at a profit in the months that followed.

Nor does the court have sufficient evidence regarding the acquisition of No. 10 to determine whether the $37,663.92 in damages that Plaintiffs' attribute to it were proximately caused by the claimed fraudulent conduct. Michele testified that No. 10 was acquired in December 2006. There is no evidence before the court regarding the closing and whether the parties were obligated to close. There is no evidence before the court whether the closing occurred before Plaintiffs began to determine that the business venture was not proceeding as planned. There is a statement that they were not able to obtain a construction loan, but nothing further was proffered.

### B.     Misuse of Joint Venture Funds Nondischargeable Under § 523(a)(4)

Plaintiffs established that significant funds from the FrontRunner account were used by the Defendants to pay personal expenses. Doreen admitted this to be so, but claimed that a significant portion of the expenses were paid from her personal monies placed into the FrontRunner account for her personal use. As described earlier, the court does not find Doreen's testimony credible.

In their Post-Trial Submission Plaintiffs ask for the court to find the sum of $20,963.22 as nondischargeable under § 523(a)(2)(A). The second count of the complaint seeks nondischargeablity under § 523(A)(4) as a defalcation while acting in a fiduciary capacity. After reviewing P-2, Exhibit A to the post-trial submission, and Doreen's testimony, the court views her use of the business venture funds as an embezzlement under § 524(a)(4).

Embezzlement for purposes of § 524(a)(4) is defined as "the fraudulent conversion of the property of another by one who is already in lawful possession of it." *In re Sherman,* 603 F.3d 11,

19

13 (1st Cir. 2010)(citing *United States v. Young,* 955 F.2d 99, 102 (1st Cir. 1992)). It is the knowledge that the use lacks authorization that makes the conversion embezzlement. *(Id.)* For example, the court in *Young* observed that unauthorized borrowing with intent to repay is still embezzlement, the borrowing being unauthorized. 955 F. 2d at 104.

There was certainly no testimony that Defendants had the agreement of Plaintiffs to use the funds in the FrontRunner account for personal expenses. Doreen's inability to document her statements that some of the expenses identified on P-2 were in fact business expenses must be counted against her. She was the sole signatory on the account and she was the only individual keeping the financial records for the business venture. Accordingly, the court finds the sum of $20,963.22 is non-dischargeable under § 523(a)(4).

## **CONCLUSION**

As set forth in the proceeding paragraphs the court finds that Plaintiffs have not met their burden of proof to deny dischargeability of their alleged damages under § 523(a)(2). However, under § 523(a)(4) the court finds that the sum of $20,963.22 is nondischargeable.

Dated: August 17, 2010                        _____/s/_____
                                              NOVALYN L. WINFIELD
                                              United States Bankruptcy Judge